`                       UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF MICHIGAN
                              NORTHERN DIVISION


RICKY EUGENE GROSS,

                          Petitioner,

v.                                              Case No. 06-10715-BC
                                                Honorable Thomas L. Ludington
SHERRI BURT,

                          Respondent.
_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION
## AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

Petitioner Ricky Eugene Gross, presently confined at Macomb Correctional Facility in New

Haven, Michigan, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Petitioner was convicted in Wayne County Circuit Court of two counts of first-degree murder, two

counts of assault with intent to commit murder, and one count of possession of a firearm during the

commission of a felony (felony firearm).  He was sentenced to two years in prison for the felony

firearm conviction, followed by concurrent terms of life imprisonment for the murder convictions

and twenty-five to fifty years in prison for the assault convictions.  He alleges that he is incarcerated

in violation of his constitutional rights.  Respondent has filed an answer in opposition to the habeas

petition, urging the Court to deny the habeas petition.  The Court agrees with Respondent that one

of Petitioner's claims was not exhausted as a federal constitutional claim in state court, that two of

Petitioner's four claims are procedurally defaulted, and that none of the claims warrant granting the

writ of habeas corpus.  Therefore, the habeas corpus petition will be denied.

I.

A.

Petitioner was charged in Wayne County, Michigan with one count of premeditated murder, Mich. Comp. Laws § 750.316(1)(a), one count of felony murder, Mich. Comp. Laws § 750. 316(1)(b), three counts of assault with intent to commit murder, Mich. Comp. Laws § 750.83, and one count of felony firearm, Mich. Comp. Laws § 750.227b. The charges arose from a shooting on November 28, 2002, at a night club on East Warren Avenue in Detroit. The incident occurred as Petitioner, "while carrying a gun, grabbed a man's wrist and demanded the man's watch; when the man broke free and dove inside the entrance of a club, defendant fired several shots into the crowd in the club's foyer, which wounded two victims and killed another." *People v. Gross*, No. 252590, at 1 (Mich. Ct. App. Mar. 22, 2005).

Following a jury trial in Wayne County Circuit Court, the jury acquitted Petitioner of one count of assault with intent to murder, but found him guilty, as charged, of the other counts. The Michigan Court of Appeals affirmed Petitioner's convictions, but remanded his case for entry of an amended judgment of sentence that reflected one murder conviction based on two different theories (premeditated murder and felony murder). *See id.* at 5. On August 30, 2005, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Gross*, 474 Mich. 857; 702 N.W.2d 580 (2005).

B.

Petitioner filed his habeas corpus petition in this Court on February 17, 2006. His claims are:

I.      The trial court's denial of Petitioner's motion to suppress was clearly
        erroneous because there was an insufficient independent basis for an
        accurate identification after eyewitness Marcia Spivey viewed a
        suggestive live lineup, where the petitioner was the only participant

with light colored eyes, and Ms. Spivey was informed by the officers that they had apprehended the suspect from another state, who would be included in the live lineup.

II.      Petitioner was denied a fair trial when the jury was permitted to view the petitioner's unedited mugshot and hear testimony that Officer Mason viewed the petitioner's picture on the local cable show "Detroit's Most Wanted", which suggested to the jury that the petitioner had committed other crimes in the past.

III.    The trial court invaded the jury's fact finding function by instructing the jury that Petitioner's state of mind could be inferred from the use of a dangerous weapon.

IV.    Defense counsel was ineffective in failing to properly request limiting instructions on the jury's use of the evidence of the petitioner's "state of mind", and in failing to make objections to the improper introduction of the petitioner's unedited mugshot and testimony that Officer Mason viewed the petitioner's front and side picture on the local cable show "Detroit's Most Wanted."

Respondent asserts in an answer to the habeas petition that Petitioner did not exhaust state remedies for his second claim by raising the claim as a federal constitutional issue in state court.

The doctrine of exhaustion of state remedies requires state prisoners to fairly present their claims in each appropriate state court before seeking a federal writ of habeas corpus. 28 U.S.C. § 2254(b)(1); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). There are four actions a petitioner can take to "fairly present" his claims in state court:

(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citing *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987)). "General allegations of the denial of rights to a 'fair trial' and 'due process' do not

'fairly present' claims that specific constitutional rights were violated." *Id.* (citing *Petrucelli v. Coombe,* 735 F.2d 684, 688-89 (2d Cir.1984)).

Petitioner "fairly presented" his first, third, and fourth claims to the state courts as federal constitutional issues, but he presented his second habeas claim to the state courts as a state evidentiary issue. He relied on Michigan Rule of Evidence 404(b) and state decisions interpreting that rule. Although he also cited two federal decisions, those cases were based on the comparable Federal Rule of Evidence. None of the cited cases employed constitutional analysis, and he did not phrase the claim in terms of constitutional law, nor allege facts well within the mainstream of constitutional law. His brief reference to a "fair trial" was insufficient to alert the state courts that he was raising a federal constitutional claim. Therefore, Petitioner did not "fairly present" his second claim to the state courts as a federal constitutional issue.

Ordinarily, the Court must dismiss a habeas petition containing exhausted and unexhausted claims. *Rose v. Lundy*, 455 U.S. 509, 510, 522 (1982). The unexhausted second claim, however, does not warrant habeas relief, and the exhaustion requirement is not a jurisdictional bar to substantive review of a habeas petitioner's claims. *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005), *cert. denied sub nom Houk v. White,* __ U.S. __, 127 S. Ct. 578 (2006), *and cert. denied sub nom White v. Houk,* __ U.S. __, 127 S. Ct. 581 (2006). Consequently, Petitioner's failure to raise his second claim as a federal constitutional issue in state court is excused. The Court will proceed to summarize the facts and analyze all of Petitioner's claims.

II.

Nannette Estelle testified that, at 12:25 a.m. on November 28, 2002, she received a call from Marcia Spivey, who informed her that Nanette's daughter, Leslie Estelle, had been shot in the head.

Leslie was twenty-four years old at the time. Dr. Francisco Diaz testified that Leslie died from a single gunshot wound to the head and that the manner of death was homicide.

Police Officer Derrick Mason testified that, after he got off work on November 27, 2002, he went to the Club Med on East Warren Street with his brother. As he identified himself at the door as a police officer so that he could keep his weapon with him, he heard two gunshots from behind him. He stepped inside the club and tried to withdraw his weapon. As he turned around, he saw a man come through the door with a gun in his hand. The man turned toward Officer Mason, raised his gun, and shot Mason. A bullet struck the officer on the arm and lodged in his elbow. The shooter then left the club.

Officer Mason was unable to locate the shooter when he went outside, but he identified Petitioner at trial as the shooter. He claimed that he had observed the shooter's profile for four to six seconds when the shooter first stepped into the club. He saw the front of the shooter's face and maintained eye contact with him from seven to ten feet away when the man turned toward him and raised his weapon. While he was being treated in the hospital, Officer Mason described the shooter to a detective. On the following morning, he saw a composite drawing of the shooter and informed the detectives that the drawing was a good picture of the man who shot him. There was no name attached to the composite drawing.

In June of 2003, Officer Mason recognized a picture of the shooter on the television show "Detroit's Most Wanted." He then informed a homicide detective that the man's name was Ricky Eugene Gross. The detective later showed him a series of six photographs. He was unsure about the second photograph and stated that he would have to see the person. The second photograph

depicted Ricky Michael Gross.[1]

In July of 2003, Officer Mason resumed working at the 11th precinct. One day he observed video arraignments being conducted in the holding cell area, and he recognized Petitioner as the man who had shot him. Officer Mason also identified Petitioner at the preliminary examination, and he was certain at trial that Petitioner was the man who shot him even though Petitioner had longer hair and a beard by then.

Kerry Mason testified that he accompanied his brother Derrick Mason to the Club Med and that he heard four or five gunshots by the front door of the club. He did not see anyone with a gun, but he ran across the street when he heard the gunshots. In his statement to the police later that day, he described the gunman as wearing a puffy beige coat with fur around the hood and pants of a similar color. Kerry did not see the man's face, as the man was wearing the hood on his head.

Eugene Harris testified that he was getting ready to enter the Club Med on November 27 or 28, 2002, when someone tapped him on the shoulder, grabbed his wrist, and told him to hand over his watch. The man was holding a gray automatic gun. Harris focused his attention on the gun, not on the gunman's face. He yanked his arm away from the gunman and dove inside the door. Then he heard two or three gunshots. He was shot two times on the back of his leg. He described the man as wearing a puffy gray or beige coat with a fur-trimmed hood. The hood was over the man's head. Harris was unable to identify anyone in a line-up held on July 24, 2003.

Police Officer Michael Carlisle testified that, in June of 2003, Officer Mason informed him that he saw Ricky Gross on "Detroit's Most Wanted." Officer Carlisle then went to the Central Photo Unit of the Detroit Police Department where photographs are kept of people who have been

---

[1] Petitioner is Ricky Eugene Gross.

held in the custody of the Police Department.  He requested a photograph of Ricky Gross and was given a photograph of Ricky Michael Gross.  He prepared a photo array with that photograph as the second of six photographs.  Upon viewing the photo array, Officer Mason stated, "I'm not sure if it's number two.  I'll have to see him in person."  At the time, Officer Carlisle did not know that Ricky Michael Gross was not the defendant, Ricky Eugene Gross, whom Officer Mason had seen on television.

In July of 2003, Officer Carlisle received a telephone call from Officer Mason, who informed him that a person who had been brought into the 11th precinct police station was the man who had shot him and whom he had seen on televison.  Officer Carlisle learned the name and identifying information about the person from police arrest records.  He determined that the man whom Officer Mason had seen was the defendant, Ricky Eugene Gross.

Carlisle then acquired a mug shot of Petitioner from the Detroit Police Department.  He subsequently conducted a live line-up for Spivey, who made an immediate identification and stated that suspect two (Petitioner) was the man whom she saw shooting a gun in the vestibule of the nightclub.  The attorney who monitored the line-up made the following notation about the line-up:

> Immediate positive ID.  Note, suspect only one in line-up with light colored eyes.
> This was brought to sergeant's attention prior to line-up.

Officer Carlisle did not notice Petitioner's light-colored eyes before the attorney brought them to his attention, and Ms. Spivey did not say anything to Officer Carlisle about Petitioner's light-colored eyes.

There was no trace evidence linking Petitioner to the crime.  The parties stipulated that four casings found at the crime scene and one casing, which fell out of Officer Mason's clothing, were fired from the same weapon.  The parties also stipulated that there was no gun in evidence, that the

casings were not fired from Officer Derrick Mason's gun, and that there were no usable fingerprints on the casings.

Spivey testified that she and Leslie Estelle arrived at the Club Med nightclub at 12:21 a.m. on November 28, 2002. After Spivey paid the admission fee and Leslie checked her coat, Spivey heard three to four gunshots. She and Leslie crouched down. Spivey then heard more gunshots and turned her head. She did not recall seeing anyone walk in to the club, but she observed a man with a gun, and she looked at his face for three to four seconds from six to seven feet away as he faced her. She identified Petitioner at trial as the gunman. She was certain he was the gunman she saw in the nightclub. She did not see the person actually shoot a gun, but she assumed that he was the shooter because he had a gun. She saw just one person with a gun and the gunman was the suspect, not Officer Mason. She assumed that the gunman left after firing the series of shots, because he was gone when she turned around to tell Leslie that they should leave. She noticed that blood was running down Leslie's hand. Spivey applied pressure to the wound near Leslie's ear, but Leslie died before EMS arrived. Spivey then called Leslie's mother and told Mrs. Estelle that her daughter had been shot and was dead.

Spivey talked to the police later that same day and participated in making a composite drawing of the shooter. When they finished with the drawing she was satisfied that it matched the person she had seen. About eight months later, she viewed a line-up of five people. She picked out suspect number two and stated that he was the man who was shooting in the vestibule of the club. She did not notice the color of Petitioner's eyes or the eyes of anyone else in the line-up. She recognized the suspect by his facial features, including his nose, the way his eyes were set, and his lips. She did not think it was possible that she identified the wrong person.

Petitioner did not testify or present any witnesses. The defense theory was that the case was one of misidentification and that reasonable doubt existed. Defense counsel argued to the jury that there were far more people who could not identify the shooter than there were people who could identify him and that there was no other evidence pointing to Petitioner as the shooter.

The jurors initially could not reach a decision. Ultimately, they acquitted Petitioner of the charge of assault with intent to murder Spivey. They found Petitioner guilty, as charged, of the other counts.

III.

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of

federal law." *Id*. at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.

"Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original). Furthermore, section "2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted). In addition, "state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)).

## IV.

### A.

Petitioner alleges that the trial court erred when it denied his motion to suppress Spivey's identification of him. According to him, Ms. Spivey viewed a suggestive pretrial lineup and there was an insufficient basis for Spivey's identification of him at trial.

The trial court held an evidentiary hearing on this issue and concluded that the line-up was not conducive to irreparable misidentification. The Michigan Court of Appeals agreed that the line-up was not impermissibly suggestive. The court of appeals stated that physical differences between Petitioner and other participants in the line-up affected only the weight given to the identification.

The United States Court of Appeals for the Sixth Circuit has summarized Supreme Court

decisions on suggestive pretrial identifications as follows:

> The admission of evidence derived from a suggestive identification procedure violates a defendant's right to due process if the confrontation leading to the identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967); *Neil v. Biggers*, 409 U.S. 188, 197 (1972). In analyzing whether a defendant was denied due process of law, [courts] conduct a two step inquiry. *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005), *cert. denied*, 546 U.S. 1100 (2006). First, [courts] assess whether the identification was unnecessarily suggestive. *Id.* If so, [courts] then consider whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure. *Id.*

*Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007).

The question on review of an unnecessarily suggestive pretrial procedure is

> "whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977). *Manson* sets forth five factors for consideration in determining whether a suggestive identification was nevertheless reliable: (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification. *Id.* at 114; *see also Neil*, 409 U.S. at 199-200.

*Id.*

1.

Petitioner alleges that the pretrial identification procedure was unduly suggestive because he was the only person with light-colored eyes. Although the fact that Petitioner was the only man with light-colored eyes may have distinguished him from the other individuals in the line-up, neither Officer Derrick Mason nor Spivey informed the police that the suspect had light-colored eyes.[2]

---

[2] The descriptions given to the police included details about the suspect's height, weight, and hair, but nothing about the eyes. (Tr. Oct. 2, 2003, at 6-7.) Officer Derrick Mason described the suspect as 5 feet,11 inches to 6 feet tall, 190 to 200 pounds in weight, between 18

"[U]nless the witness described the distinctive characteristic to the police beforehand, that characteristic is not a basis for finding a lineup unduly suggestive." *Howard v. Bouchard*, 405 F.3d at 471. Furthermore, Spivey testified that she did not notice the eye color of the participants in the line-up or the fact that Petitioner's eyes were different from those of the other individuals. She claimed that it was Petitioner's facial features, including his nose, lips, and the setting of his eyes, besides her memory of the incident, that enabled her to recognize him. (Tr. Oct. 2, 2003, at 13; Tr. Nov. 4, 2003, at 54-55, 60.)

Petitioner alleges that the line-up was suggestive for an additional reason: the police informed Spivey that the defendant or a possible defendant was extradited from another state, was brought into the precinct, and might be the individual that Spivey saw at the nightclub. (Tr. Oct. 2, 2003, at 16-17.) "[A]lthough the police generally should refrain from informing a witness that the suspect is in the lineup, a lineup is not unduly suggestive merely because they do so." *Jenkins v. New York*, 478 F.3d 76, 93 (2nd Cir. 2007) (citing *Sales v. Harris,* 675 F.2d 532, 538 (2d Cir. 1982)).

> [A]ny witness to a crime who is called upon to view a police lineup must realize that he would not be asked to view the lineup if there were not some person there whom the authorities suspected. To ignore this fact is to underestimate average intelligence. Thus, telling this to a witness may in many instances be relatively harmless.

*United States v. Gambrill*, 449 F.2d 1148, 1151 n.3 (D.C. Cir. 1971).

Furthermore, Spivey testified that she was asked to identify the person she had seen at the

---

and 25 years old, medium-light complexion with a bald head and light mustache, and wearing dark clothes. He did not notice the suspect's eye color. (Tr. Nov. 3, 2003, at 227.) Eyewitness Spivey helped an officer prepare a composite drawing of the suspect, but the record does not include her description of the suspect to the police. She claimed at trial that she and the officer spent most of the time working on the nose. (Tr. Nov. 4, 2003, at 48.)

nightclub if she could do so and to tell the police if she did not see the suspect.  (Tr. Oct. 2, 2003, at 16-17.)  The police also gave her written instructions, which stated in relevant part:

> In a moment I'm going to show you a group of people.  Within this group the person who committed the crime now being investigated may or may not be present.
>
> The fact that you are being shown these people should not cause you to believe or guess that the guilty person has been caught.  You do not have to identify anyone.  It is just as important to free innocent persons from suspicion as it is to identify those who are guilty.
> . . . .
>
> When you have completed studying each person, please tell me whether or not you can make an identification.

(Tr. Nov. 4, 2003, at 19-20.)  The identification procedure did not make it all but inevitable that Spivey would identify Petitioner.  *Cf. Foster v. California*, 394 U.S. 440, 443 (1969).  The Court therefore concludes that the pretrial identification was not "so unnecessarily suggestive and conducive to irreparable mistaken identification that [Petitioner] was denied due process of law." *Stovall v. Denno*, 388 U.S. at 302.

### 2.

An independent basis also existed for the in-court identification of Petitioner.  Spivey had an adequate opportunity to view the suspect.  She observed him for three to four seconds from six to seven feet away.  The Court places trust in the degree of her attention  because she observed the suspect during the commission of the crime when she had a reason to pay attention to the perpetrator.  *Howard v. Bouchard*, 405 F.3d at 473.  Her prior description must have been accurate, because the composite drawing, which she helped to create, bore a strong resemblance to Petitioner. The fact that she picked Petitioner out of the line-up almost immediately indicates that she was certain of her identification.  She also testified that she was positive Petitioner was the man she saw

standing in the nightclub with a gun.

Although eight months elapsed between the crime and the line-up, that factor alone does not render Spivey's in-court identification so unreliable as to be inadmissible. *United States v. Rundell*, 858 F.2d 425, 427 (8th Cir. 1988). "Rather, the passage of time was a proper item for cross-examination and closing argument, *see Manson v. Brathwaite*, 432 U.S. at 113, 97 S. Ct. at 2252 and n.14, and a circumstance for the jury to consider in assessing the weight to be given the identification testimony." *Id.*

Because there was an independent basis for the in-court identification and because the pretrial identification was not unnecessarily suggestive, the state court's adjudication of Petitioner's first claim was objectively reasonable.

### B.

Petitioner alleges next that he was denied a fair trial because: (1) the jury was permitted to view his unedited mugshot; (2) Detective Carlisle testified that the mugshot came from the Police Department's Central Photo Unit, which contained photographs of people who were in police custody at some point in time; and (3) Police Officer Mason testified that he saw Petitioner's picture on the television show "Detroit's Most Wanted." Petitioner maintains that the mugshot and the officers' testimony suggested to the jury that he had a criminal record and was wanted for other crimes. He claims that this evidence was highly prejudicial and an irrelevant attack on his character.[3]

---

[3] Although Petitioner claims that the mugshot was used in the photo array which Officer Mason viewed, Officer Carlisle testified that he never showed the mugshot to anyone for identification purposes. The Court understands the record to say that a photograph of Ricky Michael Gross, not Petitioner Ricky Eugene Gross, was used in the photo array.

Respondent argues that Petitioner's claim is procedurally defaulted. A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The state procedural rule in question here is Michigan's contemporaneous-objection rule, which requires defendants to make timely and specific objections at trial in order to preserve their claims for appellate review. *See People v. Carines*, 460 Mich. 750, 761-68; 597 N.W.2d 130, 137-40 (1999); *People v. Grant*, 445 Mich. 535, 546; 520 N.W.2d 123, 128 (1994). The Michigan Court of Appeals determined that Petitioner did not object at trial to the introduction of the evidence in question.[4] Consequently, the court of appeals reviewed Petitioner's claim for "plain error" affecting

---

[4] The mugshot apparently was the same likeness of Petitioner as People's exhibit 2, which was the picture of Petitioner that was shown on "Detroit's Most Wanted." Defense counsel objected to the admission of exhibit 2, but not on the ground that the exhibit was a mugshot and constituted evidence of other crimes and an attack on Petitioner's character. He objected because the picture was ten years old and because Officer Carlisle did not check with the producers of "Detroit's Most Wanted" to determine whether Ricky Michael Gross or Ricky Eugene Gross had been featured on the show. Defense counsel also did not object to Officer Mason's testimony about "Detroit's Most Wanted" or Officer Carlisle's testimony regarding the mugshot. The Michigan Court of Appeals therefore was correct in finding that Petitioner did not object to the evidence.

Petitioner's claim about propensity evidence would lack merit even if the claim were not procedurally defaulted, because

> [t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence . . . . While the Supreme Court has addressed whether prior acts

-15-

substantial rights. The court of appeals concluded that the disputed evidence was probative of Petitioner's identity as the shooter and that the somewhat prejudicial nature of the evidence was minimized by the trial court's jury instructions and the lack of specific evidence regarding Petitioner's prior conduct.

The state appellate court's review for "plain error" constitutes enforcement of a procedural default. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). The contemporaneous-objection rule was an adequate and independent state ground for denying relief because the rule was in effect long before Petitioner's trial in 2003. Therefore, Petitioner must establish "cause and prejudice" or a "miscarriage of justice" before this Court can consider the substantive merits of his claims.

1.

Petitioner alleges in habeas claim IV that his attorney should have objected to the mugshot and to testimony regarding the Police Department's photo unit and the photograph on "Detroit's Most Wanted." Constitutionally ineffective assistance of counsel is "cause" to excuse a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). However, to prevail on a claim of ineffective assistance, Petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668 , 687 (1984).

An attorney's performance is deficient if "counsel was not functioning as the 'counsel'

---

testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003). Because there is no Supreme Court decision holding that the admission of "other acts" evidence violates the Constitution, the state court's decision cannot be deemed "contrary to" Supreme Court precedent under 28 U.S.C. § 2254(d). *Id*. at 513.

guaranteed the defendant by the Sixth Amendment." *Id.* "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700. However, the Court "need not decide whether defense counsel performed deficiently if disposing of an ineffective-assistance claim on the ground of lack of sufficient prejudice would be easier." *United States v. Hynes*, 467 F.3d 951, 970 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697).

The evidence in dispute was somewhat prejudicial because it suggested, at a minimum, that Petitioner had been arrested in the past and was suspected of committing a crime. Use of a mugshot, however, is not always reversible error in a habeas corpus proceeding. *See, e.g., Murray v. Superintendent*, 651 F.2d 451, 454 (6th Cir. 1981) (explaining that mugshot evidence is unfair and prejudicial because it informs the jury that the defendant has a criminal record, but that constitutional error did not infect the petitioner's state trial because the mugshot revealed nothing that the jury did not already know and the limiting instruction was adequate to cure any incremental prejudice).

The mugshot and related testimony in this case was necessary to establish how the police acquired a name for the suspect. Officer Carlisle's testimony that he contacted the Central Photo

Unit of the Detroit Police Department was necessary to explain how he inadvertently acquired the photograph of Ricky Michael Gross and how he subsequently obtained information about Petitioner.

Even if the Court were to assume that defense counsel's failure to object to the evidence amounted to deficient performance, the deficiency did not prejudice the defense. As the state court recognized, the evidence was minimized by the fact that there was no testimony regarding the nature of Petitioner's prior arrest or criminal history. Additionally, the trial court read the following instruction to the jurors:

> You heard some evidence that was introduced to show that the Defendant may have been involved in some other bad, you know, acts. For instance, when they talked about seeing the thing on the Most Wanted and so forth. If you believe this evidence you must be very careful to only consider it for a certain purpose. It was -- you may only think about whether this evidence tends to show, or at least in this case, the context of Mr. Mason's testimony, how it lead him to the name and the further identification that he said he made. You must not consider this evidence for any other purpose. For example, you must not decide that where he saw that at showed that the Defendant is a bad person or he is likely to commit crimes. You must not convict the Defendant here because you think he is guilty of other bad conduct. All the evidence in this case must convince you beyond a reasonable doubt that the Defendant committed the alleged crimes charged here or you must find him not guilty.

(Tr. Nov. 4, 2003, at 139-40.)

Furthermore, there was substantial evidence of Petitioner's guilt, despite testimony regarding the mugshot, Detroit's Most Wanted, and the Central Photo Unit of the Detroit Police Department. Two eyewitnesses, Derrick Mason and Marcia Spivey, identified Petitioner as the gunman. Their testimony would have been sufficient to convict Petitioner even if there had been no mugshot or testimony regarding "Detroit's Most Wanted" and the Central Photo Unit of the Police Department. The alleged evidentiary errors were not so overwhelming that they substantially affected the jury's verdict. *Cf. Ford v. Curtis*, 277 F.3d 806, 811 (6th Cir. 2002) (explaining that evidence that the

habeas petitioner was among the FBI's Ten Most Wanted List and appeared on the television show "America's Most Wanted" had nominal relevance and was prejudicial, but that the "bad acts" evidence did not substantially affect the jury's verdict and, therefore, the state court did not unreasonably conclude that the error was harmless).

The Court concludes that defense counsel's failure to object did not prejudice the defense. Because Petitioner has failed to prove the prejudice prong of *Strickland*, the Court need not decide whether counsel's performance was deficient. *Hynes*, 467 F.3d at 970. Defense counsel was not constitutionally ineffective or "cause" for Petitioner's procedural default.

2.

It is unnecessary to determine whether Petitioner was prejudiced as a result of the alleged constitutional error, because he has failed to establish "cause" to excuse his procedural default. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). The remaining question is whether a miscarriage of justice will occur from the Court's failure to adjudicate the substantive merits of Petitioner's claim. The narrow exception for fundamental miscarriages of justice requires a habeas petitioner to demonstrate that the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Carrier*, 477 U.S. at 496. "To be credible, such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327.

Petitioner has not presented any new evidence to support a claim of actual innocence. Therefore, a miscarriage of justice will not occur as a result of the Court's failure to consider his claim on the merits.

C.

The third habeas claim alleges that the trial court invaded the jury's fact-finding function by instructing the jury that Petitioner's state of mind could be inferred from the use of a dangerous weapon. Petitioner contends that the jury instruction eliminated any defense and shifted the burden of proof to him. He asserts that the jurors may have thought they were required to infer that he intended to commit murder or they may have confused the inference with a presumption, because the trial court did not inform them that they were not required to make such an inference or that other inferences were possible.

1.

This claim is procedurally defaulted because Petitioner failed to object to the jury instructions at trial, and the Michigan Court of Appeals reviewed the claim for "plain error." Petitioner alleges that his attorney should have objected to the trial court's instruction on his state of mind. In order to evaluate defense counsel's performance, it is necessary to consider Petitioner's underlying claim about the jury instruction.

The United States Court of Appeals for the Sixth Circuit has explained that,

> [t]he Due Process Clause of the Fourteenth Amendment requires a state to prove beyond a reasonable doubt every fact necessary to constitute the offense charged. See *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 1072, 25 L. Ed.2d 368 (1970). A trial court may not give a jury charge which shifts to the defendant the burden of proving a critical fact in dispute, see *Mullaney v. Wilbur,* 421 U.S. 684, 701, 95 S. Ct. 1881, 1891, 44 L. Ed.2d 508 (1975), nor may a court instruct a jury that proof of the existence of certain facts automatically establishes the element of intent where intent is an element of the charged offense. *Sandstrom v. Montana,* 442

U.S. 510, 523-24, 99 S. Ct. 2450, 2458-59, 61 L. Ed.2d 39 (1979).

*Warner v. Zent*, 997 F.2d 116, 133 (6th Cir. 1993).

The disputed jury instruction in this case reads:

> You must think about all the evidence in deciding what the Defendant's state of mind was at the time of the alleged killing, what the killer's state of mind was at the time of the alleged killing. That stat[e] of mind may be inferred from the kind of weapon used, the type of wounds inflicted, the actions and words of the killing, and other circumstances surrounding the alleged killing. You may infer that a person intended to kill if they use[d] a dangerous weapon in a way that is likely [to] cause death. Likewise, you may infer that the killer intended the . . . result that followed from the use of a dangerous weapon. A gun is a dangerous weapon.

(Tr. Nov. 4, 2003, at 148; *see also* Tr. Nov. 4, 2003, at 152-53.) The language "may be inferred" and "you may infer" is unambiguously permissive language, and permissive inferences, as opposed to mandatory inferences, are not problematic. *Coe v. Bell*, 161 F.3d 320, 331-32 (6th Cir. 1998). "A permissive presumption places no burden on the defendant but permits the jury to 'infer the elemental fact from proof by the prosecutor of the basic one.'" *Miskel v. Karnes*, 397 F.3d 446, 455-56 (6th Cir. 2005) (quoting *County of Ulster v. Allen*, 442 U.S. 140, 157 (1979)). Furthermore, the trial court instructed the jurors that the prosecutor had the burden of proving each element of the crimes, including intent, beyond a reasonable doubt. The trial court also instructed the jurors that Petitioner was presumed innocent and was not required to prove his innocence or to do anything.

The instructions as a whole did not shift the burden of proof to Petitioner, did not require the jury to presume an intent to kill, and did not invade the province of the jury. Therefore, Petitioner's attorney was not ineffective for failing to object to the jury instruction on state of mind. Petitioner has failed to establish "cause" for his procedural default.

The Court need not consider whether he has shown prejudice, because he has not established "cause," and the narrow exception for fundamental miscarriages of justice does not apply because Petitioner has not presented any new evidence in support of a claim of actual innocence. Petitioner's third claim is procedurally defaulted.

D.

The fourth and final habeas claim alleges that defense counsel was ineffective for failing to (1) request a limiting instruction on the proper use of evidence concerning Petitioner's intent or state of mind and (2) object to the introduction of Petitioner's mugshot and Officer Mason's testimony that he viewed Petitioner's picture on "Detroit's Most Wanted." The Court reviewed these claims in connection with its procedural-default analysis of Petitioner's second and third claims. Having determined that defense counsel was not constitutionally ineffective and therefore not "cause" for Petitioner's procedural defaults, the Court further concludes Petitioner has failed to state an independent claim of ineffective assistance of counsel.

V.

The state appellate court's decision in this case was not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. Therefore, Petitioner has not established that he is in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**. Reasonable jurists would not debate the Court's assessment of Petitioner's constitutional claims. Nor would reasonable jurists debate whether the Court was correct in finding that Petitioner

procedurally defaulted two of his claims.  Accordingly, it is further **ORDERED**, pursuant to *Slack*

*v. McDaniel*, 529 U.S. 473, 484 (2000), that a certificate of appealability is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 16, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 16, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS